GUILLERMINA CINTRÓN SALGADO ET AL., Plaintiffs and Appellants, *v.* MATILDE AND MARIO CINTRÓN SALGADO, ETC., ET AL., Defendants and Appellees.

No. 9921. Argued November 15, 1949.—Decided January 16, 1950.

---

*Romany & Romany* for appellants. *José E. Bosch Roqué* and *Luis A. Archilla Laugier* for appellees. *E. Márquez Huertas* as *amicus curiae*.

MR. CHIEF JUSTICE DE JESÚS delivered the opinion of the Court.

José Cornelio Cintrón owned a rural property consisting of 78 acres (*cuerdas*) situated in the ward Galateo of Toa Alta and sold it to his daughter Matilde Cintrón Salgado, by deed of August 18, 1931 for the price of $5,000. Subsequently, by deed of January 9, 1935, Matilde segregated from the aforesaid property a parcel of 1,214 square meters, with a house, which she kept for herself, and by the same deed sold to her father the remaining land for $5,000. On July 6, 1943, José Cornelio Cintrón executed an open will before Notary Enrique Márquez Huertas whereby he declared as his heirs his legitimate children Guillermina, Blanca, Carmen María, Manuel, Matilde and Mario Cintrón Salgado, and his grandchildren, Matilde's children, Gladys Esther and Wilfredo Alvarez Cintrón; he left to his daughter Matilde the third of extra portion and to said grand-chil-

dren the third of free disposal. On the same day that he executed the will, José Cornelio Cintrón, by deed before Notary Manuel Torres Reyes, leased to Encarnación Alvarez, Matilde's husband, the land remaining from the farm of 78 acres, for a period of fifteen years at a monthly rental of $50. José Cornelio Cintrón died on November 11, 1946; without having revoked his will and while the contract of lease was in force. Four years later, on August 18, 1947, his children Guillermina, Blanca, Carmen María, and Manuel Cintrón Salgado filed suit against their sister Matilde, their brother Mario Cintrón Salgado, who being incapacitated was represented by his tutrix Aurora Alvarez, and against the aforesaid children of Matilde, represented by Encarnación Alvarez, their father with *patria potestas*. They set up three causes of action. In the first they prayed for the nullity of the will on the grounds hereinafter set forth; in the second, that the contract of sale executed between José Cornelio Cintrón and his daughter Matilde, should be declared void on the ground that it was simulated, in order to include, as part of the inheritance estate, the parcel of land of 1,214 square meters with the house that the daughter had segregated and kept for herself; and in the third, they asked that the contract of lease executed between José Cornelio Cintrón and his son-in-law Encarnación Alvarez, be declared void for lack of consideration.

Judgment was rendered dismissing the complaint and the plaintiffs have taken the present appeal. We shall take separately the errors concerning each one of the causes of action.

## I

### *Nullity of Will.*

The appellants maintain that the will is void because the notary did not certify that all the formalities required for an ordinary open will by the pertinent Sections under Article Fifth, Chapter I, Title III, Book Third of the

Civil Code had been complied with. One of the alleged violations of that Section [1] consists in that the notary did not certify that the testator expressed his last will to the notary and to the witnesses before drawing up the will.

In the original edition of the Spanish Civil Code, § 695 [2] provided, in its pertinent part: "The testator shall state his last will *in the presence of the witnesses and of the notary* . . ." (Italics ours.) Couched in such terms, §695 was subject to the construction proposed by appellants herein. But taking advantage of the revision of the Code made under the Law of May 26, 1889, that Section was amended on that point, in terms similar to § 645 of our Code, [3] as follows:

"The testator shall state his last will to the notary and to the witnesses."

Having eliminated the words "in the presence of the witnesses and the Notary," it forecloses any probability of requiring the presence of the witnesses during the preliminary stage before drawing up the will. This requirement

---

[1] Sec. 649 of the Civil Code, contained in § 5, provides:

"All the formalities mentioned in this article, shall take place in a single act, and no interruption shall be allowed, except such a one as may be caused by a momentary incident.

"The notary shall certify, at the end of the will, that all said formalities have been complied with and that he is acquainted with the testator or with the witnesses of identification in a proper case."

[2] Section 695 of the Spanish Civil Code, prior to its revision, provided:

"The testator shall state his last will *in the presence of the witnesses and the notary. The latter shall draw up the clauses which he shall read aloud,* also in the presence of the witnesses, in order that the testator may state if he is in conformity therewith. If so, it shall be signed by all those who are able to do so, and the notary shall also state the place, hour, the day, the month and the year of execution. Should the testator declare that he does not know how or is not able to sign, one of the attesting witnesses or some other person shall do so for him at his request, the notary certifying the fact. The same thing shall be done if any one of the witnesses is unable to sign.

"The notary shall always certify that the testator has the legal capacity to execute the will." (Italics ours.)

[3] Section 645 of the Civil Code of Puerto Rico provides:

"The testator shall declare his last will to the notary and to the witnesses. The will when drawn in accordance with it and with the

was contrary to the established practice.[4] To this effect Ramón Novoa Seoane states at p. 49 of vol. 15 of *Revista de Derecho Privado:*

"Moreover: the testators are usually remiss to have any other person besides the notary take part in the juridical confession, as it may be called, that precedes the will, which is the semi-secret act wherein they speak their mind, and seek advice to perfect it; . . ."

To require that at this preliminary stage preceding the drawing up of the will, the witnesses be present, would be tantamount to preventing in a majority of cases, the execution of intricate wills which require deep reflection and study. The continuity of the act required by § 649 of the Civil Code does not commence at this preliminary stage, but when after the will has been drawn up according to the wishes of the testator, the notary proceeds to read it aloud in the presence of the testator and the witnesses. It is in this act that the testator shall declare whether the will which has just been read is in conformity with his wishes. If so, he shall sign with the witnesses and the notary. Decisions of the Supreme Court of Spain of June 5, 1894, April 6, 1896, June 18, 1896, June 28, 1909 and December 29, 1927; Manresa, *Comentarios al Código Civil Español* (3d.

---

expression of the place, the year, the month, the day and the hour of its execution shall be read aloud in order that the testator may declare that it is in conformity with his intention. Both the testator and the witnesses may read the will themselves and the notary must inform him of this, his right. If the testator and the witnesses consent the will shall be signed in the act by the testator and by the others who can do it. If the testator declares that he does not know or that he cannot sign, one of the witnesses to the instrument shall do it for him at his request, or another person, and the notary shall certify to that fact. The same shall be done when some of the witnesses cannot sign.

"The notary shall always make it appear that in his judgment the testator is of the legal capacity necessary to execute a will."

[4] The Supreme Court of Spain, in its Decision of June 18, 1896, held that the presence of the witnesses was not necessary during the preliminary stage of the will even in cases of a will executed prior to the revision of § 695.

ed., 1910), vol. 5, p. 543; F. Clemente de Diego, *Instituciones de Derecho Civil Español*, (1932 ed.), vol. 3, p. 66, note 1; Castán, *Derecho Civil, Común y Foral* (6th ed., 1944), vol. 4, p. 312; Scaevola, *Comentarios al Código Civil Español* (1896 ed.), vol. 12, pp. 422–423.

According to F. Clemente de Diego, *op.* and vol. *cit.*, p. 52, the formalities of the will should be neither more nor less than those actually needed to make the last will authentic. It seems clear, therefore, that the notary did not violate § 649 of the Civil Code in not certifying that said formality had been complied with. Consequently, the lower court did not err in refusing to annul the will on that ground.

 Appellants complain that the notary did not certify either: (*a*) that the will had been drawn up in conformity to the last will declared by the testator to the notary and to the witnesses; (*b*) that it was the notary, and no other person, who read the will aloud; (*c*) that once the will was read, the testator stated that its contents were the expression of his will, or the manner in which he made such statement; (*d*) that all the formalities took place in a single act; (*e*) that at least one of the witnesses knew how and was able to read and write; and lastly (*f*) that at the end of the will it was not stated in general terms that all the formalities required by Article Fifth, Chapter I, Title III, Book Third of the Civil Code, had been complied with.

For a better understanding of the discussion which follows, we must have before us the pertinent clause of the will. It reads:

"And having read aloud and in a clear voice this will that was executed in a single act and that according to the testator he has executed no other will, and having informed the testator and the witnesses of their right to read it themselves, and all having stated their conformity it is signed by all, to all of which, as well as to the personal knowledge of the party and the witnesses and of their age, status, occupation and residence, with respect to their having stated so, I, the Notary, attest."

The relative pronoun "that" after the words "this will", has undoubtedly given rise to the theory of the appellants that it was the reading and not the will which took place in a single act. No doubt would have arisen if instead of the relative pronoun "that", after the words "this will", the word "which" would have been used. But reading the phrase as a whole: "Having read aloud and in a clear voice *this will that was executed in a single act and that according to the testator he has executed no other will,*" (italics ours) we can readily see that it is the will and not its reading that prevailed in the mind of the notary; and what took place in a single act was the will with all its formalities, among which was its reading aloud. We turn to the applicable portion of § 645 of the Civil Code bearing on this point:

". . . The will when drawn in accordance with it [the will of the testator] . . . shall be read aloud in order that the testator may declare that it is in conformity with his intention. Both the testator and the witnesses may read the will themselves and the notary must inform him of this, his right. If the testator and the witnesses consent the will shall be signed in the act by the testator and by the others who can do it. . ."

Whether it is indispensable for the validity of an open will that the notary himself read it aloud, is a debatable question among the commentators of the Spanish Civil Code. Manresa, construing § 695 with reference to § 696 of the Spanish Civil Code, is of the opinion that the duty of reading the will aloud falls on the notary. However, he adds that the textwriters as well as the case law—citing the Decision of February 4, 1879 of the Supreme Court of Spain —have admitted that any of the appearing parties may read the will. *Op.* and vol. *cit.*, p. 547. And in an article published by Traviesas in *Revista de Derecho Privado*, vol. 22, p. 143, in connection with open wills, he cites Fernández Casado to the effect that since § 695 only provides that the will shall be read aloud, without stating who shall read it, it should be understood that it is the notary's duty to do so.

But immediately following he sets forth the views of López Gómez that the reading may be done by the testator, the notary or any of the witnesses. Castán contends that from the language of § 695, read together with §§ 696 and 698 of the Spanish Civil Code, *it may be inferred* that the reading [the reading aloud] should be done by the certifying notary. Lastly, Scaevola expresses himself in the following terms:

"After the will has been drawn up *it shall be read* aloud, in order that the testator alone may declare that it is in conformity with his intention, for the Notary and the witnesses should confine themselves to certifying that they heard the testator make such declaration. It is immaterial whether the testator reads himself the document in which he states his last will or whether he has it read by some other person, provided that after the reading, the Notary as well as the correct number of witnesses hear him say that it is his will." *Op.* and Vol. *cit.*, p. 429.

It is significant that § 695 of the Spanish Civil Code, prior to its revision—see footnote 2—provided: "The testator shall state his last will *in the presence of the witnesses and of the Notary. The latter* shall draw up the clauses and *shall read them* aloud,". (Italics ours) ; and after revised it provides: ."The testator shall state his last will to the notary and to the witnesses, and the testament shall be drawn up in accordance with the same, . . .. after which *it shall be read* aloud. . ." (Italics ours.)

This Section does not say who should read the will. We should presume that those who revised said Section did not act arbitrarily in changing the language on the matter concerning the reading. And if, as it is well known, the purpose of the reading aloud is that the testator and the witnesses learn its contents and the former may declare that it is in conformity with his intention, does not the view taken by Scaevola and by López Gómez seem more logical and realistic insofar as they maintain that the reading may be done by the testator, or the notary or any of the witnesses?

We concede that the notary, in view of the divergence of opinions, should have been more specific concerning the compliance with this formality. However, in any event, we do not agree with the appellants that the will does not disclose that it was complied with. In the instant case, the notary, in drawing up the clause as to the reading, followed the language of § 645. He wrote:

"And having read aloud and in a clear voice this will, . . . informing the testator and the witnesses of their right to read it themselves, and all having stated their conformity it is signed by all . . ."

It is inferred from this clause, rationally construed, that it was the notary who read the will aloud and that it was he who informed the testator and the witnesses of their right to read it themselves. It seems clear that if the testator or any one of the witnesses would have read it aloud, the notary would not have stated later, that he informed the testator and the witnesses of their right to read it themselves, but would have merely informed those who had not read it.

■ That once the will was read, the testator declared that its contents were in conformity with his intention, is obvious from the introduction to the first paragraph of the will which in its pertinent part, says: ". . . it appears that he is really in excellent conditions to execute this will *in conformity with his wishes* and he does so *in this manner, as he sets forth,*" (italics ours) in connection with the closing clause of the will which states: "and all having stated their conformity it is signed by all. . ." As Ramón Novoa Seoane says in his article:

". . . and upon the notary stating that it is drawn up in conformity with the instructions of the testator, and it being approved by the latter at the time of the reading, the requirement is fulfilled, which, in any event, would have remained established by the mere approval of the testator to the will after its reading, and with this approval there is no question

that it clearly exhibits the intention of the testator previously expressed, because without this condition there can be no will."

■ It was not necessary in this case for the notary to certify that at least one of the witnesses knew how or was able to read and write. This provision is intended for when the testator or one of the witnesses does not know how or can not sign. Scaevola, *op.* and vol. *cit.*, p. 420. In such case, pursuant to § 645 of the Civil Code, one of the subscribing witnesses or any other person, shall sign for those who cannot sign at their request, and the notary shall certify to that fact. But in the present case, according to the will, the testator and the three witnesses knew how and could sign and actually did sign.

■ It is true that at the end of the will the notary did not insert the clause ordinarily included in the drawing up of open wills, to the effect that all the formalities required in connection with said will had been complied with. But under the circumstances of this case, could it be said that the omission of that clause avoids the will? It is convenient to note the liberality with which the Supreme Court of Spain, fixed on the purpose that the testator's wishes be carried out, has construed these formalities. For example, § 695 of the Spanish Civil Code requires that the reading of the will be done aloud. Notwithstanding this, the Decision of April 6, 1896 holds that the failure to state that the notary read the will aloud when it states that he read it, does not avoid the will, simply because it should be inferred that he read it aloud in order to inform those who subscribed it of its contents. Another example of this liberality is found in the Decision of the same Court [5] of

---

[5] We cite this decision as a mere illustration of the laxity of the Supreme Court of Spain in order to avoid that the intention of the testator be frustrated.

Censuring this Decision, Traviesas has said in the *Revista de Derecho Privado*, vol. 22, p. 130:

"I have no faith in the legality of this doctrine. If it were well-grounded, there would be no reason for not applying it in the case

November 21, 1889. It concerned a will where one of its witnesses lacked seven months to attain the age of twenty-three as required by § 681, subd. 2, with reference to § 320 of the Spanish Civil Code. However, the will was upheld, in view of the fact that the witness was considered generally as of legal age, and that the possession of such status, according to the Supreme Court of Spain, should operate, for those who in good faith required his intervention, the same as if he actually was of legal age. Undoubtedly every notary, in order to avoid the least reason for impeachment, should insert this general clause at the end of the document. But §649 of our Civil Code does not require the use of a sacramental pattern for expressing compliance with all the formalities. If as in the instant case, the will reveals that each and every one of those formalities was complied with, would the failure to state in a general way, that those formalities were fulfilled, warrant the annulment of the will?

 Another reason alleged for the nullity of the will is the fact that the notary did not certify that the testator affixed his initals to each one of the sheets of the will.[6] This formality is not included among those required by Article Fifth, Chapter I, Title III, Book Three of the Civil Code. It is required by § 12 of the Notarial Act of Puerto Rico, as amended by Act No. 7 of March 23 of 1937, p. 128, which insofar as material, provides:

"Original instruments shall be written on sheets of paper or pages . . . and on which the parties to the instrument shall affix their initials . . ."

of an heir, who in good faith, accepts an inheritance and it later appears that the testator was under fourteen years of age or twenty-three, if the will was holographic, although he was considered generally of legal age, under the attendant circumstances. The will would have to be considered as valid and that would be inadmissible."

[6] At the end of the will the notary inserted below the signatures of the testator, of the witnesses and his own, purporting to comply with § 12 of the Notarial Act, a footnote, without signing it, which says:

"In all the pages of this open will the initials of the testator have been affixed and at the end, his signature and that of the witnesses and of the Notary. . ."

The provision copied above is not in conflict with the formalities required for an open will. The Act to regulate the practice of the Notarial Profession in Puerto Rico is supplementary to the provisions of the Civil Code which we have previously discussed.[7] Consequently, in an open will, as in any other document, compliance should be had with the requirement of § 12 above quoted. This does not mean that the deeds are void if they lack that formality. Section 20 of the Notarial Act, expressly enumerates the cases when public instruments shall be void. It says:

"The following public instruments shall be null and void:
"1st. Those in which the notary authorizing same has intervened as a party thereto, or which contain any provision in his favor.
"2nd. Where the relatives of the parties concerned therein, or the relatives, clerks or servants of the notary authorizing the instrument, are witnesses thereto.
"3d. Those in which the notary fails to certify as to his knowledge of the parties, or to supply this deficiency with witnesses of identification, or where the signature of the parties and witnesses, and the signature, mark and rubric of the notary, when requested, do not appear."

Since this formality is not included among the cases of nullity enumerated in the aforesaid Section, we are constrained to conclude that its omission is an irregularity which does not avoid the public instrument.

Having disposed of the errors assigned with respect to the first cause of action, we shall now proceed to discuss the errors concerning the second and third causes of action.[8]

---

[7] Section 22 of the Notarial Act provides:
"The provisions herein contained as to the form of public instruments and number and qualifications of witnesses, and capacity to acquire property left or bequeathed by a testator, shall not apply to wills and other *causa mortis* dispositions, which shall be subject to the special law or laws applicable to each of those cases."
*A contrario sensu,* the other provisions of the Notarial Act are applicable to wills before a notary.
[8] We have not mentioned the cases of Louisiana, although the appellants have cited several from that State, first, because the statutory pro-

## II

*Nullity of the Contract of Sale executed between José*
*Cornelio Cintrón and the defendant*
*Matilde Cintrón Salgado.*

As we have already said, José Cornelio Cintrón sold his property of 78 acres to his daughter Matilde in 1931, for $5,000. The theory of the plaintiffs is that Matilde Cintrón Salgado never owned any property with which she could purchase said property; that she always resided with her father, who supported her until she was married; that after the property was sold to her, and while it was leased to Cía. Azucarera del Toa, the check in payment of the rental was drawn in her favor; that she cashed it and delivered the money to her father, who, as plaintiffs allege, continued to be the true owner of the property. To support this cause of action the plaintiffs introduced the testimony of Carmen María Cintrón, defendant's sister. She testified that her father had eight children, two of whom died before him without leaving descendants; that her father supported them all and that they all lived with him at his house; that when the alleged sale took place, in 1931, Matilde was unmarried and was still living with her father; that Matilde had no property, or occupation and that she had never worked in any employment; that the property had been leased to Cía. Azucarera del Toa and that when the check in payment of the rental arrived, it was cashed and her father received the money. On cross-examination she testified that what she had said about the rentals was a fact known to her because Matilde herself and her father had told her; [9] that in con-

---

visions of Louisiana dealing on the question involved herein are not the same as those of the Civil Code; and in the second place, because the decisions of the Supreme Court of Spain and the opinions of the commentators of the Spanish Civil Code who construe provisions substantially similar to those of our Civil Code, should prevail over any authority interpreting provisions not similar to those of our Code.

[9] What her father told her, on motion of the defendants and over the objection of the plaintiffs, was stricken by the court.

versations with her sister Matilde in the country, the latter told her that she cashed the checks from the Central and delivered the money to her father. On being cross-examined again she testified that she went to live to New York in 1930 and had ever since lived there permanently; and upon being questioned by the court she answered that she had come to Puerto Rico three or four times; that the last time she came was in May, 1947 after her father had died; that he died in November, 1946; that she came in September of that same year and spoke with her sister with respect to their father's illness and Matilde told her that she cashed the checks and gave the money to her father.

It is fair to state that while this witness was testifying, the only one who referred to the simulation of the sale, the defendant and her husband were in the courtroom and neither of them took the witness stand to contradict her. Notwithstanding this, the court overruled this cause of action. The only ground for overruling was stated as follows: "The court is of the opinion, according to the evidence, that those sales were not simulated. The evidence offered by the plaintiff has not convinced us that those sales were in any way simulated or fraudulent. Fraud is never presumed."

The court can not refuse to believe a witness whose testimony has not been contradicted, unless there is a justifiable reason for not believing him. *Caballero* v. *González,* 53 P.R.R. 513.

We should bear in mind that the witness is defendant's sister; that all her life, until one year prior to the execution of the alleged contract of sale, they lived together in the same house and were being supported by their father; and that the defendant had no occupation and never worked for other persons. If in 1930 the defendant was as insolvent as the witness testified—and there is no doubt that the latter knew it of her own knowledge, for until then they had lived together all the time—and if we take into account her poor ability to earn money, it is logical to infer, in the absence of evidence

to the contrary, that during the year between 1930, when the witness left for New York, and 1931 when the alleged contract of sale was executed, the defendant could not have saved the amount of $5,000, the price of the property. It is true that defendant was not bound by law to testify at the trial, but we can not shut our eyes to the fact that in view of the testimony of the witness Carmen María Cintrón, in the presence of the defendant and her husband, any reasonable person, upon hearing a false testimony, would have taken the witness stand to contradict it. Even discarding that part of the testimony which refers to what the defendant had told the witness with respect to the payment of the rentals, we do not understand the reason that the lower court had to hold that both the sale made by the father to the defendant and by the latter to the former, were not simulated. We should not lose sight of the well-settled principle that transactions between close relatives that might prejudice other persons, should be examined with caution. *Mackall* v. *Mackall*, 135 U.S. 167. If the defendant in fact never had any money with which to purchase that property, no other conclusion can be reached except that the deed of sale executed by the father in favor of his daughter lacked a just price. And if the sale made by the father in favor of the daughter was simulated, the subsequent deed whereby the daughter kept for herself a portion and sold the rest to her father, was also simulated. The lower court, therefore, erred in not granting the second cause of action.

## III

### *Contract of Lease between the Father-in-law and the Son-in-law*

The facts that the term of lease was fifteen years; that when the contract was executed the lessor was seventy years of age and that on that same day he executed his will, as a matter of law, do not avoid the contract of lease. The

owner had a perfect right to lease his property. It is possible that the lessor believed that despite his seventy years, he could live until the termination of the lease; and the fact that the rental was lower than what he could have obtained from a lease to an outsider, does not annul the contract either. Consequently, we must conclude that the lower court did not err in overruling the third cause of action.

For the reasons stated, the judgment appealed from will be reversed as to the second cause of action, and the complaint granted as to the same, decreeing that the whole property described in the second paragraph of the second cause of action, including the parcel of land of 1,214 square meters and the house, which is described in the fifth paragraph of said cause of action, belongs to the inheritance estate; and it is affirmed as to the first and third causes of action, with costs on the plaintiffs but without attorney's fees.